Good morning. My name is Philip May. May it please the Court, my name is Philip May. I am the attorney for the appellant, Cathay Enterprises, Inc. With me today is my co-counsel, Devin Srichirana, as well as Sam Huang, who represents Cathay. This dispute arose in 2001. The suit was filed in 2002. It wasn't until 2009 that the parties got their day in court. After a three-day trial and nine months of post-trial briefing, the trial judge determined that Design Trend had materially breached its contract with Cathay in interjudgment against Cathay, or against, for Cathay. On appeal, the district court reversed, finding that the trial court clearly erred in its factual conclusions. Cathay appeals that reversal. In overturning the judgment of the trial court, the district court ruled first that Cathay was collaterally stopped by virtue of its recourse to the registrar of contractors to argue that Design Trend had failed to complete performance on the contract. Second, the district court concluded that the trial court implicitly considered and found that Cathay had not waived its material breach defense. And third, that the trial court's implicit no-waiver finding was clearly erroneous. Therefore, the district court ruled that Cathay had waived its material breach defense, and thus justifying the overturn of the trial court's judgment. Each of these rulings are in error. The district court's reversal is based upon the false premise that Design Trend fully performed its contract obligations and that Cathay received the full benefit of Design Trend's services. I may be missing something, but it seemed to me that the district court was basing upon Arizona law, which indicates it looks like a Fisher cut bait thing. You either have to cut off and sue, or you waive. Am I missing something? Yeah. I believe what the district court concluded was that there was an election of remedies issue here, and the district court concluded and literally said in its first opinion, which was issued in March of 2011, and I'll read the judge's rationale. He says, The result of the Bankruptcy Court's decision is that Cathay received the full benefit of Design Trend's services, but only had to pay a fraction of what it agreed to pay, as if Cathay elected a specific performance-type remedy, pursued that remedy to resolution through the registrar of contractors proceeding, and secured the entire benefit of the contract. Are you arguing that the judge was wrong on Arizona law, or are you arguing that he was wrong on the facts? I'm arguing that he is wrong on the facts, because the facts don't support his legal conclusion. Well, going back to Judge Wallace's question, though, if you don't declare breach and stop everything, but you permit additional performance, that's what happened here, right? They permitted additional performance, correct? I would characterize it differently than that, Your Honor. What would be your words? Okay. So, and this is based in large part I want a long story. I want to know, tell me, what did they do? You said you wouldn't say that they permitted late or additional performance. In, by October of 2001, Design Trend had walked off the job. That's what the trial court found. Within six months, Cathay filed a registrar of contractors complaint, primarily focused on workmanship issues. It resulted in corrective work order. It resulted in corrective work. Design Trend didn't do all the corrective work as ordered by the registrar of contractors. And then the registrar of contractors filed a citation and complaint against its licensee, held a hearing, determined that its licensee had not complied with its workmanship quality, workmanship obligations, suspended its license, and found that its conduct was wrongful and damaging to Design Trend, or to Cathay. Cathay then went back on the workmanship issues several months later. And a year and a half after the first registrar of contractor proceeding, a second corrective work order was issued, and Design Trend was directed by its licensor under fear of the loss of its license to go out and do the work it had already performed properly. That is not the same thing as compelling them to complete their work. Absolutely isn't. By May of 2002, long before the first registrar of contractors hearing. That's where I think we're having some collision with Arizona law, because, you know, the district court apparently, based on your answer to Judge Wallace's question, the district court apprehended Arizona law correctly in terms of if there's a breach, you can stop and sue for the breach, or there's continued performance, then it goes on, and it may not be perfect performance, and then you might have some claim. But you seem to say that it's neither of those, but that's how Arizona law puts it. So that's where we're having maybe some difficulty with your argument. Well, the issue – let me step back a step. The issue is material breach or immaterial breach, or full performance, okay? The judge – the trial court judge found material breach, and in a material breach, the question is, does the party that's breached, are they entitled to any additional compensation? And the answer is, they can get restitutionary relief if they seek it and secure it. And you'll see in the record that the trial judge said over and over in his minute entries post-trial, design trend, you didn't – you weren't foreclosed from seeking additional compensation for services rendered. But because of your material breach, you had to pursue your quantum merit claim, which you brought and pursued in civil court and through the bankruptcy court all the way up through the pretrial statement, and then you abandon it. This is what Judge Baum told them repeatedly. They weren't deprived of the opportunity for compensation. Judge Baum said you materially breached. I think the question that we're trying to struggle with here is – and I'd appreciate your enlightenment – the district court looked at Hunter and Independent Bank and said, if you're going to win on this, you've got to stop right then and bring a suit. Instead, your client went ahead and dealt with the – how the district judge is either right or wrong on his law on that issue. But it seems to me it's critical, at least in my view of the case, that we have to come to grips with that initially. So was the district court – what – at the time, was the district court correct that you did – your client did go ahead and work with the design trend and, therefore, waived their opportunity? That's what the district court says, relying on Arizona law, which I don't understand. But that's what Hunter and Independent Bank seems to say. I think Hunter and Independent Bank stand for the proposition that if you elect your remedy and you pursue that remedy to compel them to specifically perform, then perhaps you have elected your remedy because you have gotten the full benefit of their performance. But we never got the full benefit of their performance. We did elect to sue them, and they elected to sue us in this case, starting in 2002. The recourse to the registrar of contractors, it wasn't permitting them to do their job. It was saying, you have done a lot of work in this hotel, you haven't completed your work, and the work that you've done, you've done improperly. Poor workmanship. And your licensor, through its corrective work orders, has confirmed that. Fix what you've messed up. Let me – I'm sympathetic with that. I mean, it just seems to me what you're saying is very logical. But does Hunter and Independent Bank allow you to do that? Does allow the hotel to do that? Well, yes, it – yes, they absolutely do. Those cases don't stand for the proposition that a citizen of the State of Arizona can't avail itself of the regulatory authorities to require a licensee to provide services to minimum legal standards. And that's what we did. The notion that Judge Wake relied upon is that – and he said it in his original opinion – that we cannot force them to complete their work, get the full benefit of their services, and not pay for it. That's not the facts in this case. It didn't happen that way. Now, understand that when Judge Wake originally issued his ruling in March of 2011, he concluded that they were forced to and did, in fact, complete their work. We then filed a motion for reconsideration saying, Your Honor, at trial, we presented a wealth of evidence of costs that we've incurred because, in fact, the work wasn't performed. And Judge Wake withdrew the referral, became the trial judge for the – for the limited purpose of taking a look at all the work that wasn't performed and the damages that we sustained in the form of offset, and actually found $54,000-plus worth of work that the register of contractors didn't direct them to do because it couldn't. By the time we got to the register of contractors' hearings on workmanship issues, we had already paid the $20,000-some-odd with the furniture, fixtures, and equipment which were part of that contract that they didn't provide. But we had already paid subcontractors to do work that they didn't provide. I mean, the election of remedies isn't – you know, the only thing we elected to do was to go to a State agency and say, make your licensee do the work that it's done to minimum standards, and you've seen the corrective work orders. At that point, Your Honor, and I'll point out that the original administrative law judge actually said in his ruling, he said, we are confirming that various aspects of the dispute pending in the – are pending in the civil proceeding. So even the administrative law judge understood that the contract disputes were being handled within the civil court system by the time the first administrative hearing took place. So two separate things. We didn't – we didn't elect through the administrative process, nor could we. And Judge Wake even found this. We couldn't force them to pay damages. We couldn't force them to complete work which, by then, we had already done in mitigation of our losses, which is established by the offsets. Fifty-five thousand dollars' worth of offsets. So the question from a – I mean, if you take a step back and look at the public policy perception, could the law in Arizona possibly be that once a contractor has – has failed to perform, has performed poorly in terms of workmanship, do you have to go to the civil court, and do you have to forego availing yourself to the administrative process to hold them accountable as a licensee? That can't be the law. Or if it is, it needs to be chiseled in stone and put above the registrar's Do not come through these doors if you expect to receive or secure any sort of contract relief for breach, because we can't do that for you. But if you come through these doors, you've waived any claims. That cannot be the law. That is not the law. That's not what Hunter stands for. So – so what does Hunter and independent banks stand for? What does it prevent, as you interpret those cases? I think those are standard election of remedy cases, that if you pursued a resolution, a – a effort to compel total performance, then that's your – that's your remedy. You cannot secure total performance through legal process and – and then expect to secure breach of contract damages at the same time. But if you look at – there's a variety of cases here, but Judge Baum, Judge Wake, and all the parties have focused on the restatement of contracts in this regard as it relates to material and immaterial breaches. That issue is – is talked about in terms of substantial performance in the construction arena. Those cases provide that once there's a determination of material breach, and that determination by the trial judge is absolutely supported by the facts and the record, once that determination is made, it's not the end of the discussion about compensation because you have this restitutionary right, which they walked away from at trial. Judge Wake seemed to be bothered, to be honest with you. He was looking – the focus – an interesting set of circumstances as we go from one trial court to a trial court sitting as an – in its appellate capacity. But when you go from his first opinion, when he said, gee, you can't force them to complete the work and get the full benefit and not pay for it, to a year later, his – his second opinion, which formed the basis of his judgment, in which in the second page where he has findings of fact, he says, gee, and I find that by – by April of 2000 or March or April of 2003, I believe, they substantially performed. And the reason he had to migrate from his, you can't force them to complete their work and – and not pay for it, to, gee, they substantially performed, is because in the interim, he had to go back and take a look at the trial record and recognize that they absolutely didn't complete their work, that we have a functioning hotel and we have to go back and – and make it work. Let me see if I understand. If we didn't go on this waiver notion, because you're saying, in effect, you think that would be improper, and if you're saying that the offsets show that they didn't actually substantially perform the contract, correct? The offsets by the – that were determined by, ironically, the appellate court in its fact-finding capacity absolutely established without any question that the appellate court had to complete, through the administrative process, that was about workmanship. Right. The administrative process. The administrative process. But – but in terms of the other offsets, you're saying that you go to, quote, the appellate opinion, the second opinion. The second opinion with regard to the determination. Well, there's two things in the appellate opinion. That – that those offsets are of a nature, then, to show that substantial performance was not completed. Well, absolutely, the Court can take a look at the judgment entered by Judge Wake, his order and the judgment, and determine that there was not substantial completion. And certainly, we didn't elect to and compel them to fully perform, and certainly we didn't get the benefit of that performance, because Judge Wake himself found $54,000 worth of offsets. And believe me, the record had a lot more evidence than that. That's what he found as the second finder of fact. Of course, Judge Baum didn't have to go there as the trial judge, because he concluded there's material breach. And, gee, design trend, you didn't put on restitutionary claim. That was your determination, not mine. And therefore, we're done. And so he didn't have to look at our offset arguments. We never compelled them to complete the work. What Judge Baum did was, Judge Baum basically said he put the materiality issue aside in its entirety. He said that Judge Baum, the trial judge, must have dealt with the material breach issue, he must have implicitly, and then he overruled that implicit determination. From our perspective, if you find that Judge – that the trial judge, Judge Baum, actually focused on this issue of waiver, then there's plenty of evidence to demonstrate that we didn't waive our claim. How could we have waived our claim? We had a claim pending in the superior court. We had suffered substantial damages. The elements of waiver simply, you know, number one, this issue was never argued at the trial court. That's why it's not on the record. It was raised in the motion for reconsideration, should not have been considered by the district court on appeal. But if it is considered, and we are to look to this implicit decision by the trial court judge, there's ample evidence in the record to demonstrate that we did not knowingly and intentionally waive a right. And that is to avail ourselves. And that's your remaining time, of which you have none. Thirty-five seconds. Minus 35 seconds. Minus, yes, thank you. All right. Oh, my God. Good morning, Your Honors. Dennis Wolinchek for Appley Design Trends, or Trend. Your Honor, first of all, if I may, to go back to, I believe, Judge Wallace's question about Hunter and what Arizona law is. It's really pretty simple, actually, as to how it not only is, but how it operates and operates daily. And here's the deal. I'll read from Hunter directly, because I think that's the best place to start. It says in subparagraph 7, I believe it's at 735, this rule, the rule we're addressing here in terms of waiver of breach and duty of the non-defaulting party to mitigate damages. This rule provides that once a material breach in a partially performed construction contract has occurred. I don't think I have to, you know, wax poetic here. This says it right in its plain face. It talks about a material breach. It assumes a material breach. It assumes a partially performed contract. Everything counsel just spent 15 and 37 seconds arguing. And it says it provides that once that occurs, the non-defaulting party, that's apparently his client, must elect to either rescind, waive the breach, and continue performance, or terminate the contract and sue for damages. And it's terminate the contract, Your Honor, specifically that I didn't hear in that entire 15 minutes. Termination under this contract was provided for in two places, as I recall. I believe it's paragraph 7.3 addresses it and paragraph 19.2.2 addresses it. And it addresses what I believe to be basically what Arizona law is. And it says, And if the innocent party elects to continue performance, as opposed to terminating a contract and then seeking damages for cover, to keep it simple, he thereby waives that breach and he may not recover damages therefore. End of story. By saying he can't recover damages, he can't be heard to claim offsets that don't exist either. Now, let me be clear on this, because I just want to clear up all of this if I can as quickly as I can. Here's how it works to answer the Court's question. When there is an alleged breach by, in this case, Cathay, the owner, under this contract, and Cathay claims that timeliness of performance is at issue, that timeliness was breached. Or that the contract has not been fully performed. Clearly, they have at that point an option. They can either, under the contract terms, on its plain face, and I can read those terms, but I've just cited them to the Court, declare a breach, obviously, which they never did, and a termination. That puts the other party on a duty to essentially what we'll call cure, okay, before their 10 days is up that they provide the termination notice for. If the party doesn't cure within that period of time, then it's fairly obvious and fairly simple, as the law should be, I think, when it comes to contracting people and people in the contracting business, that they then understand, hey, look, you had your chance, you didn't perform, I've terminated your ability to perform at this point, and now I'm going after you for what? For damages, for the cost to finish the job, and if that cost exceeds the amount of the contract, I have a right to do that as well. But I have to prove that, even if I do that. I can't just walk into court, as counsel has really posited here, incredibly to me, you know, which obviously Judge White didn't buy, that there's evidence in this record, overwhelming evidence somehow, of their damages. There isn't. The only damages they had were minor in nature. We, as you'll see from the record, conceded all of that and said, fine, we'll agree that those were always to be offsets, they can be offsets. But here's the bottom line. Unless you terminated the contract, which is not one shred of evidence in this record to provide, not one letter, nothing, saying just in plain English, I terminate this contract under the contract, period, which would have allowed for any of these claims of damage. But by the way, they never produced any evidence of damage at the entire trial. Look through the record. That's what Judge Wake found. They never presented it. And here's why. The contract also governs, and the contract provided on its face, that they waived all of those damages under, I think, paragraph 9.11. And that simply, again, in plain English says, you don't get consequential damages for lost rentals, for the time that it's taken you internally, the people that you internally had deal with this, all that other good stuff, lost profit, lost rentals. They never produced any evidence of that. In fact, Mr. Wang admitted that at the hearing, at the trial. You know, I understand from your understanding of Hunter, which cited for its authority a 1926 case, but it seems unrealistic. I mean, people negotiate. I mean, this is sort of the ax dropping. The hotel manager can't say you're out, but it's going to cost us more if we go get somebody else and we're going to lose our hotel and it's going to go through bankruptcy if we don't work together and get this done and we'll settle out later. What you're saying is that option is not open to them. They have to at that time, they have to decide right now I'm declaring a breach or it's waived. No, Your Honor. I guess I didn't get to the second half of it. I apologize. That's the first half of it. That's if you want to sue for damages, which they didn't in this case. They produced no evidence of damage at all. The second half of it is the alternative. As I said, it's very simple. You have two options. That's the election. You can either stop the contract and say I'm done with you. I'm sick and tired of dealing with you. I'm untimely and whatever. I don't like your work. It's not up to par. Whatever, you know, the deal is. And then you terminate, simply put under the contract. You move on with somebody else. And then you either offset that amount against what was owing or you sue for the damages that you have. But the second option is the obvious one that Judge Wake found, which is, but that's not what you did here. You agreed to continue performance. You never terminated. You never sought damages. You never even claimed damages other than these offsets, which everybody always conceded. And the point is, once you do that, and contrary to what counsel said, I mean, with all due respect, he makes these broad statements and there's no citation in the record. For example, in the reply twice, they claim that the evidence is overwhelming that there was a failure to complete. The evidence isn't overwhelming. In fact, they don't make any citation to the record at all in that. Let me come back to the point. Once you agree to work with the contractor, answer your question as simply as I can, and once you agree not to pursue termination, then you've got to live with that, and what you've got to do is allow performance. Now, once you allow performance, which regardless of when that performance occurred, did occur, and Judge Wake found it had to have occurred by, I believe he said, February of 2003, Judge Morton, the second ALJ, found essentially that not only was Mr. Wang not credible, but he couldn't present any evidence of what wasn't completed with any particularity at all. That, Judge Wake found, has to be a finding at least by that date that Mr. Wang was allowing performance. Contrary to what was said about something above the courthouse door or something. Kagan. What he's saying on that point, if I understood him, is that here there seems to be some crossover between quality and then actual performance, and so he's saying that you, for example, you can't use the fact that they went to this administrative process to complain about the quality of the workmanship to somehow pull the rug out from under them in terms of actually getting performance. I think that's his argument. Well, if that's his argument, it's just wrong. First of all, the issue, as you know, if you read, and I'm sure you have the transcripts, is that the Registrar considered more than that. That was part and parcel of some of it, but they argued the work was 50 percent completed. So completion was on the table there, and they had to have found, according to Judge Wake, that all those items had been completed. And how do you know that? Because, again, they don't produce one iota of evidence of any offset for any work performed other than what they were credited with by Judge Wake, which I don't know how more fair he could be. He said, look, on the second alternative, if you allow that performance, you don't terminate, you go forward and compel it through the Registrar, contrary to what was said, that's what you're doing. You're compelling performance. That's what the Registrar only can do. They can only compel you to perform. And once you do that and you get what you're entitled to by that work, and you've waived any damage claim under your contract or by failing to produce any evidence of it, regardless of whether you could have done it there or elsewhere, you didn't produce any evidence at any time of any damage, then what you've done is the second part of the equation, which, as I said to Judge Wallace, I didn't get to earlier, and that is you at that point are not in a position to have terminated and claimed damage. What you're in a position to is accept that performance, and you then have to pay, is what Judge Wake's decision is really all about, you then have to pay for the work performed. And what he found was you didn't present any evidence of work that wasn't performed. Notwithstanding all these statements, you didn't present anything in the record to establish the work was not performed. It was performed, and it was substantially performed, other than the offset items which Judge Wake found and credited them with. But what Judge Wake is saying is it's totally unjust and inequitable in any corner of this country that I'm aware of that I've looked at to argue seriously that you get the work even though you didn't elect behind door number one, but you went with door number two and you allowed the performance to occur. Otherwise, why would any contractor, simply put, complete the work if there was no expectation of payment in this country? That is an absurd notion which they've never even addressed, but it's real. No contractor would be put out to come back and continue performance. And by the way, abandonment was an issue at the registrar. It was found in favor of design trend. It had not abandoned. It had not refused to perform. And that's in the record, and that's what Judge Wake gave collateral estoppel to. And so what Judge Wake said is, look, it's a real simple case. And I think his conclusion, Your Honor, sums this case up, you know, far better, honestly, than I could ever do so. And I would just commend the Court to simply look at the last couple of pages of his opinion, because I think, you know, his conclusion says it all and answers it all. Let me just read in pertinent part. He says, "...from a broad perspective, the case reduces to competing instances of injustice." I agree with that. What page are you reading from? From the final page of his order, Your Honor, 16 of 17. Thank you. And his conclusion, as I read, is, and I'll paraphrase in the interest of time, but I'll try to capture it all. This case reduces to competing instances of injustice. Design trend wants money it perhaps does not deserve, and he says that because, he says earlier, we're no saints either, because, you know, we did not complete in time, as agreed. But that's the first part of the equation. And what Judge Baum found that was totally in error, and totally contrary to Arizona or any other law that I'm familiar with, was, look, once there's a material breach, I end the inquiry. We're done. You get nothing. It relieves the other party of performance. And while it's a generally true statement, it's not quite all that true, and certainly not true in this context of construction contracts. What it really says quickly is, you know, you get to suspend performance, and most of the cases I found were a contractor suspends performance based upon lack of payment, not the other way around. But having said that, what he said was, once there's a breach, I end the inquiry. I'm done. You get nothing, regardless of what work you performed. So he made no inquiries to what work was performed or when the contract was actually performed. He didn't even get into any of that, because he stopped his analysis. What Judge Wake does here, you'll see, is say, look, that's the start of the analysis, not the end of the analysis. As I read from Hunter, once there's a material breach, you don't end the inquiry. You begin the inquiry to determine whether or not there's mitigating damages and whether or not you get any damages based on the election of remedies. And so here's what he says. This is a competing instance of injustice. The design trend wants money it perhaps does not deserve. Halfday wants services without paying any money. The Court believes the foregoing resolution is the lesser injustice for two reasons. One, delay is endemic in construction projects, which is why the law provides for consequential damages. But you know, Your Honor, even in liquidated damage provisions in these instances you'll find under the law, even in liquidated damages provisions where parties in construction contracts contemplate directly damages to occur for these kinds of delays, they still cannot be penalties. They have to be reasonably related to the actual damage sustained. You can't just penalize a party or get a windfall because they were late. Even if they didn't perform the analysis, it's the same. You don't get to not pay for the work they did perform. You get to offset for the cost to complete the work, not a windfall just because they're in breach of contract. And that's where they go. Kagan. Kagan. Kagan. Let me ask you about the attorney's fees. We usually on a board of attorneys' fees, there's a basis for determining they're reasonable based on hours, hours spent, all kinds of things here. All we've got is it's reasonable, end of story. I mean, how does that comply with Ninth Circuit law? Well, I believe, Your Honor, the court in its discretion, and I think the court should uphold its discretion, did look at all the factors and did review the bills and made a determination based on those. They can hardly be heard to argue against that since they did the same thing when Judge Baum ordered their fees, if not worse. So I think they're actually stopped to make this argument. But clearly why are they stopped to make this argument? Don't throw statements like that around. What's the legal basis for saying they're stopped? Stoppable, because the position they're taking is inconsistent, as I think we argued with the position they took previously when they did the same kind of analysis when they submitted their own bills. So it's a little hard for them to now argue that that process is not appropriate. That's all. But having said that, Your Honor, I think the process was honestly appropriate. There is a basis for the time. We know what time was spent. We know how much time was spent in the trial. This case has gone on for like 10 years. So I think Judge Waken's discretion ruled that, and same with the prejudgment interest. They got that wrong in terms of how the statute works. It never changed the prejudgment rate for prejudgment interest, only for postjudgment interest. All right. Before you leave. Yeah. Sorry. I'm a little concerned. I'd like to ask a question about attorneys' fees, too, in this $87,232 issue. I'm a little concerned because it seems to me that the local rule doesn't govern, but Arizona law governs the issue. Can you help me out with that? Well, I guess I would argue very quickly that I think both need to be considered. I'm not arguing against Arizona law.  I don't think we're contrary to that. We didn't just submit, as I recall it now, a lump-sum bill and say this is our bill. I think the Court did look at the amount of time that was spent and the tasks that were spent. I think I'm not mistaken. And I apologize because I didn't spend a lot of time on this issue because I believe it to be within the discretion of the Court. But I think that we did submit sufficient records to establish, you know, without revealing any attorney-client privileges, necessarily. But CAFE challenges this $87,000 on the basis that it shouldn't be determined by a local rule, but by Arizona law. But I don't know that local rule is necessarily different. It says tax-based itemization, whatever that means. Right. But that's what the Arizona court law requires. But CAFE cites Cottonwood, and it seemed to me that they had an argument that should be looked at. Do you have anything to add to that? Well, let me be clear on what the Court is asking for. Sit down. The argument that we did not submit a task-based bill, is that what you're asking? I apologize. I'll let the record stand. I thought we had submitted a task-based bill, which is why my confusion. I'm not sure that you have to submit a task-based bill. That's what my confusion is. Well, I guess the answer is I think we submitted sufficient detail, if that's the issue, to establish the time that was spent, who provided the time, what the basis of it was. If not, I suppose the Court could remand it at worst to the court. I think the argument is that you can't tell what was in the other one, that there may have been some segregable time that should have been deducted. That's how I read their argument, and, you know, related to certain bankruptcy proceedings and things like that. Oh, I'm sorry. That's what I'm saying. There's very – there's kind of two aspects to it. There weren't time-based bills on some things. Yes, I agree. And then how do you take out things that shouldn't have been attributed to this particular litigation? I appreciate that. That's how I think their argument is. Yes, that's clear to me now, yes. Yes. Well, quickly, as Ann, on that point, very simply, we have gone through those bills. There is no time that's in there, nor was it represented to be in there, based on administrative proceedings and bankruptcy proceedings, so I challenge them on that. They haven't established anything with specificity that I could see in their briefing that actually pinpoints any time that was actually spent. It's just a generic statement. There is no time, as we've gone through our bills, that relate to proceedings other than the direct adversary proceeding. That's the best I can answer it. If there's no further questions, thank you. Okay. Thank you, Your Honor. Thanks for your time. So would you put two minutes on the clock? You used up all your time, but we asked you a lot of questions, so. Thank you, Your Honor. Let me deal with the working backwards, first, with regard to the non-proton issuance of the order. Right. Judge Wake, first of all, the judgment that or the order from Judge Wake that you were asked to take a look at was the 2011 order. It's the 2012 order that actually became the judgment, so the discussion about Judge Wake's conclusion was a conclusion reached a year before the final judgment. He entered his judgment non-proton and backdated it for a year, and he said why on the record. He said, quote, Given the intervening statutory change, the Court will enter the judgment non-proton retroactive to March 29, 2011. The intervening change was a change in the manner in which prejudgment interest was calculated that occurred six months before he, having withdrawn the referral, became the trial judge again for limited purposes. But the Arizona law clearly doesn't allow that. You have to do it for something he intended to do before, before you can have a non-proton order. Right. This is just not a situation where a non-proton order is appropriate, and as we calculated, it costs a hundred — it's a $150,000 shift in the interest charge based upon the judgment. And it's just inappropriate. It's just not a circumstance where a non-proton order should be issued based upon the law. With regard to the attorney's fees, counsel just said that we didn't go through and identify those fees that were charged for administrative purposes. That's not true. In our response to the application for attorney's fees, in fact, we highlighted entry by entry by entry, all of them up to $110,000 worth of fees, which were not resolved or incurred in the adversary, but in the administration of the bankruptcy court. They're not awardable under ARS Section 12-341-01. Eighty-seven thousand of those fees was incurred by the firm that was retained to deal with the bankruptcy issues as opposed to the adversary issues. And in that case, the record has no fee invoices whatsoever. The district court couldn't conclude that those fees were reasonable. There was nothing to look at. And Jauberg? Huh? Jauberg? Jauberg and Wills. The only thing you have is an extremely conflicted, conflicting declaration that says that they're attached as Exhibit A, but they're not. It apologizes for not having them. They're not even in the record. That's an indefensible award. Thank you. Thank you. Thank you, both counsel, for your argument today. The case of Cathay v. Design Trend is submitted.
judges: Wallace, McKeown, Gould